# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Tri-State Bobcat, Inc., a
Minnesota corporation,

        Plaintiff,

v.

FINN Corporation, an
Ohio corporation,

        Defendant.

Civil No. 16-4060 (DWF/SER)

**MEMORANDUM
OPINION AND ORDER**

---

John D. Holland, Esq., and Serena I. Chiquoine, Esq., Dady & Gardner, PA, counsel for Plaintiff.

Quentin R. Wittrock, Esq., and Richard C. Landon, Esq., Gray Plant Mooty, counsel for Defendant.

---

# INTRODUCTION

Plaintiff Tri-State Bobcat, Inc. ("Plaintiff" or "Tri-State"), is an authorized equipment dealer for several agricultural-equipment manufacturers. From May 2011 to November 2016, Plaintiff was an authorized dealer for Defendant FINN Corporation ("Defendant" or "FINN"). In 2016, after the parties could not reach an agreement on the terms of a new contract, Plaintiff sued Defendant for breach of contract and wrongful termination under Minnesota and Wisconsin equipment dealership statutes. This matter is before the Court on Plaintiff's motion for partial summary judgment and Defendant's

motion for summary judgment on all claims and counterclaims. For the reasons

discussed below, the Court grants Defendant's motion and denies Plaintiff's motion.

## BACKGROUND

I.     **The Parties' Relationship:  2011-2015**

Tri-State is a Minnesota-based equipment dealer with Minnesota locations in

Burnsville and Little Canada, and a location in Hudson, Wisconsin.  (Doc. No. 28 ("Am.

Compl.") ¶ 2.)  Tri-State is a dealer for several equipment manufacturers, including

Bobcat, Toro, Fecon, Bandit, and Wacker Neuson.  (Doc. No. 54 ("Pl.'s Memo.") at 1.)[1]

Tri-State sells equipment to customers in "ground-engaging" industries such as

construction, land clearing, farming, and landscaping.  (Doc. No. 57 ("Chiquoine Aff.")

¶ 3, Ex. 1(a) ("Tri-State Dep.") at 9.)

FINN is an Ohio corporation that manufactures hydroseeders, straw blowers, bark

blowers, and related parts.  (Doc. No. 31 at 14.)  FINN contends that its equipment is

used for soil erosion prevention, sediment control, and other related landscaping

purposes.  (Doc. No. 39 ("Wittrock Decl.") ¶ 2, Att. 1.)  FINN claims that the primary

purpose of its equipment "is to keep soil in its place and prevent it from polluting

waterways and the air."  (*Id.*)  FINN denies that its equipment is "designed, promoted, or

---

[1]     The Court cites to Plaintiff's Memorandum in Support of Partial Summary
Judgment as "Pl.'s Memo." (Doc. No. 54); Defendant's Opposition as "Def.'s Opp."
(Doc. No. 76); Plaintiff's Reply as "Pl.'s Reply" (Doc. No. 91); Defendant's
Memorandum in Support of Summary Judgment as "Def.'s Memo." (Doc. No. 38);
Plaintiff's Opposition as "Pl.'s Opp." (Doc. No. 79); and Defendants' Reply as "Def.'s
Reply." (Doc. No. 89.)

used in planting, cultivating, irrigating, harvesting, or marketing of agricultural products."  (*Id.* at 8.)

In May 2011, Tri-State became an authorized FINN dealer serving parts of Minnesota and Wisconsin.  The parameters of the parties' relationship were defined by a dealer agreement.  From 2011 to 2015, the parties renewed the dealer agreement at or around the beginning of each calendar year, and the terms of each annual agreement remained substantially the same with each renewal.  (Doc. No. 75 ("Quirk Aff.") ¶ 5.) The last dealer agreement executed by the parties, dated January 1, 2015, reappointed Tri-State as an authorized FINN dealer for the calendar year 2015.  (Wittrock Decl. ¶ 7, Att. 6 ("2015 Agreement").)  In relevant part, Tri-State agreed under the 2015 Agreement:  (1) to pay FINN for equipment that FINN supplied to Tri-State within 30 days from the date of shipment; and (2) that FINN had the right to charge interest up to 1.5% per month on any past due balance.  (*Id.*)  The 2015 Agreement also penalized Tri-State for sales outside its designated area:  "[Tri-State] selling new equipment to end user customers outside of [Tri-State's] designated territory . . . will result in a 20% charge-back penalty from [Manufacturer's Suggested Retail Price] to be commissioned back to the affected FINN sales outlet."  (*Id.*)[2]

Regarding renewal, the 2015 Agreement stated:  "This Agreement and Dealer performance[,] including results of specific sales initiatives[,] will be reviewed prior to

---

[2]     Prior executed versions of the dealer agreement indicate that the charge-back penalty was 15%.  (Wittrock Decl. ¶ 5, Att. 4 at 14033.)  The parties agreed to change the penalty to 20% in 2014.  (Wittrock Decl. ¶ 8, Att. 7 at 14020.)

the end of the calendar year.  After such review and upon mutual acceptance of the

Distribution Business Plan for the next calendar year, this Agreement will be renewed for

an additional year." (*Id.*)  The 2015 Agreement also provided that "[n]othing herein

obligates FINN to renew [Tri-State's] appointment for any period after the term identified

in the preceding paragraphs." (*Id.*)

## II.  FINN Equipment

Part of the parties' dispute centers on whether FINN equipment is governed by the

Minnesota Agricultural Equipment Dealership Act, Minn. Stat. § 325E.061, *et seq.*

("MAEDA"), and the Minnesota Heavy and Utility Equipment Manufacturers and

Dealers Act, Minn. § 325E.068, *et seq.* ("MHUEMDA").  Consequently, the parties

undertook substantial discovery regarding whether FINN equipment is used as "farm

equipment" under MAEDA or "heavy and utility equipment" under MHUEMDA.  The

parties identify four main categories of FINN equipment:  (1) hydroseeders; (2) bark

blowers; (3) straw blowers; and (4) krimpers.  (Pl.'s Memo. at 5-12; Def.'s Resp. at 4-5.)

For background purposes, the Court briefly describes the equipment.

FINN's "hydroseeders are used to help spread on top of the ground a mix of grass

seed or wildflower seed that has been agitated in a special solution in order to quickly

establish vegetation for ground cover to prevent erosion . . . and for sediment control."

(Wittrock Decl. ¶ 2, Att. 1 at 5-6.)  Gregory Lee, FINN's Vice President of Sales and

Marketing, testified that the equipment is also "used for watering purposes."  (Doc.

No. 57-4 ("Lee Dep.") at 55.)  Mr. Lee also acknowledged that hydroseeders are used in

construction, mining, and forestry applications, albeit primarily for the purposes of

erosion prevention and sediment control. (*Id.* at 42 (describing hydroseeder use in highway construction projects); 52-53 (describing hydroseeder use in mine reclamation projects); 65-66 (describing hydroseeder use in forest-fire reclamation projects).)

FINN's bark blowers are "[u]sed to spread a variety of materials such as bark mulch, soil blends, compost, and wood chips, which can be applied for landscaping, erosion control, and even construction related purposes." Bark blowers are also used for landscaping, new lawn installation, "playground safety-surface material installation," and basement construction. (Wittrock Decl. ¶ 2, Att. 1 at 6; Lee Dep. at 44.) Straw blowers are "used to blow bales of straw on the ground for erosion prevention and sediment control purposes." (Wittrock Decl. ¶ 2, Att. 1 at 7.) FINN identified four categories of projects in which its straw blowers are commonly used: (1) highway infrastructure projects; (2) residential construction projects; (3) commercial construction projects; and (4) mine reclamation projects. Regarding highway infrastructure projects, Mr. Lee testified that straw blowers are used in conjunction with hydroseeders for the purposes of revegetating roadsides. (Lee Dep. at 43.) FINN straw blowers have also been used to provide bedding for animals on livestock farms. (*Id.* at 226.)

FINN krimpers are used after seeding to hold straw in place so that it does not blow or wash away. (Lee Dep. at 44-45; 89.) FINN advertises its krimpers as the "ideal partner to any seeding project that requires the use of straw or hay to protect the seed and help it grow by retaining moisture." (Chiquoine Aff. ¶ 11, Ex. 12.)

### III. The Parties' Relationship: 2016

The parties' relationship ended in 2016 when they could not reach an agreement on the terms of a new dealer agreement. The situation stemmed from FINN's competitive concerns regarding another manufacturer that FINN believed was targeting authorized FINN dealers.

#### A. FINN's Initial Competitive Concerns

In early 2016, Tri-State entered into an agreement with that manufacturer, Fecon, Inc. ("Fecon"), to sell Fecon-branded products. (Am. Compl. ¶ 26.) FINN asserts that Fecon is a competitor of FINN; Tri-State disagrees. (*Id.* ¶¶ 30-31; Def.'s Memo. at 14.) FINN claims that Fecon is a competitor because it is a 51% owner of SWX Global, LLC, formerly known as Siteworx, LLC ("Siteworx"[3]), which began manufacturing Apex brand hydroseeders in 2015. Siteworx is also 49% owned by Fecon's Vice President of Sales, Mark Middendorf, a former FINN employee. (Fecon Dep. at 79.) Mr. Middendorf testified, as the official representative for Fecon, that Fecon provides accounting, management, and marketing services to Siteworx in support of its Apex brand hydroseeders. (*Id.* at 117-118.) In late 2015 and early 2016, FINN employees became concerned that Fecon was targeting authorized FINN dealers to set up relationships to sell the Apex brand hydroseeders. (*See* Wittrock Decl. ¶¶ 22, 24, 25, Atts. 21, 23, 24 (internal FINN emails detailing concerns about Fecon).)

---

[3] In 2014, Siteworx, LLC changed its name to SWX Global, LLC, but "everything else is the same." (Wittrock Decl., Att. 16 ("Fecon Dep.") at 80.) The parties refer to the company as Siteworx. For consistency, the Court will do the same.

To remedy its concerns, FINN added a new noncompete provision to its dealer agreements in early January 2016. (Wittrock Decl. ¶ 26, Att. 25 ("2016 Agreement").) The noncompete provision stated:

> Dealer agrees that it will not carry, represent, or sell equipment lines competitive with FINN. This includes equipment lines that are directly competitive with the units shown in Appendix A, as well as equipment lines that are manufactured or sold by a company that is also engaged, either directly or indirectly through a subsidiary, in the manufacture or sale of equipment lines that are competitive with the units shown in Appendix A.

(*Id.* ¶ 31, Att. 30.)

While FINN was preparing the 2016 Agreement, its Director of Dealer Development, Matt Hoffman, was reaching out to eight authorized FINN dealers, including Tri-State, that Mr. Hoffman determined had preexisting relationships with Fecon. (Wittrock Decl. ¶ 26, Att. 25.) On February 3, 2016, Mr. Hoffman sent identical e-mails to all eight dealers to discuss FINN's concerns about Fecon. (*Id.* ¶ 29, Att. 28.) Bill Quirk, the primary owner of Tri-State, received and forwarded the e-mail to his son and Nick Kentros the same morning. (*Id.* ¶ 30, Att. 29.) In the e-mail, Mr. Hoffman explained that "Sitework Global, LLC (50% owned by Fecon) . . . is actively pursuing Finn customers throughout N. America selling hydroseeders" and that FINN was concerned "that Siteworx Global/Fecon has acquired Finn customer lists" and "are actively pursuing existing Finn customers and Finn dealers for representation of their products." (*Id.*) Mr. Hoffman closed the e-mail by asking for a time to speak with Bill Quirk "so that you might be able to understand our plans and concerns with this

competitive threat and our expectations on how, together with our dealers, we defend our position in the marketplace." (*Id.*)

Mr. Quirk acknowledged that he read Mr. Hoffman's e-mail and understood FINN had competitive concerns about Fecon, but stated that he "had no intention of discussing Fecon with the FINN company" because he "will not discuss one manufacturer with another manufacturer." (Tri-State Dep. at 22.) Both FINN employees, however, testified that they had a follow-up telephone conversation with Mr. Quirk. (Doc. No. 77 ¶ 7, Att. 6 ("Hoffman Dep.") at 59-62; Lee Dep. at 121-123.) In mid-March 2016, FINN sent the proposed 2016 Agreement to Tri-State. (Wittrock Decl. ¶ 31, Att. 30; Tri-State Dep. at 23-24.) In April 2016, Mr. Hoffman traveled to Tri-State's offices to execute the 2016 Agreement, and Mr. Hoffman left with the impression that Mr. Quirk would sign the agreement. (Hoffman Dep. at 32.) By May 2016, however, FINN had not received a signed 2016 Agreement from Tri-State and had not heard from Tri-State regarding any concerns about the 2016 Agreement. On May 9, 2016, Mr. Hoffman e-mailed Mr. Quirk: "I have not received your 2016 signed Finn dealer agreement that I delivered a couple weeks ago. If you could sign and send back I'd appreciate it. Please call with questions." (Wittrock Decl. ¶ 32, Att. 31.)

Mr. Quirk testified in his personal capacity and as the official representative of Tri-State that he received a copy of the 2016 Agreement and noticed the new noncompete provision. (Wittrock Decl. ¶ 15, Att. 14 ("Quirk Dep.") at 73; Tri-State Dep. at 24.) Mr. Quirk stated that one reason he did not sign the 2016 Agreement was because he was aware of other Fecon dealers that were negotiating with FINN regarding the noncompete

provision. (Tri-State Dep. at 25.) Through at least May 2016, in addition to not signing the 2016 Agreement, Mr. Quirk never discussed his concerns about the noncompete provision with FINN and never responded to FINN's e-mails concerning the 2016 Agreement. (Tri-State Dep. at 43-44; 77-78.)

### B. Tri-State's Relationship with Fecon

In the first half of 2016, Tri-State began exploring and ultimately solidified a formal dealer relationship with Fecon. Mr. Quirk testified that he was "very interested in becoming a [Fecon] tractor dealer" because Fecon was offering interest-free financing, "which is a big part of being an equipment dealer." (Quirk Dep. at 117-118.) On March 25, 2016, Tri-State and Fecon began formally negotiating the terms of a dealer agreement under which Tri-State would sell Fecon tractors, in addition to Fecon heads and other Fecon attachments that Tri-State had sold for years. (Chiquoine Aff. ¶ 21, Ex. 18.)

On May 5, 2016, after some negotiations, Fecon and Tri-State executed the dealer agreement. (Wittrock Decl. ¶ 40, Att. 39.) On May 25, 2016, Tri-State and Fecon began discussing how to announce their new "partnership." (Wittrock Decl. ¶ 41, Att. 40.) Two days later, Tri-State announced via Twitter that it was "a FECON dealer selling mulching tractors and attachments." (Chiquoine Aff. ¶ 28, Ex. 25.) However, because of publication timing, Tri-State and Fecon were not able to publish a press release until August 8, 2016. (Wittrock Decl. ¶ 42, Att. 41; Tri-State Dep. at 47.) Shawn Casey, President and CEO of FINN, claims that FINN did not learn of Tri-State's new Fecon dealer agreement until reading the press release on August 8, 2016. (Doc. No. 50

("Casey Decl.") ¶ 8.) The press release stated that Tri-State was "adding the Fecon FTX tractor line" to its existing offering of Fecon products. (Wittrock Decl. ¶ 42, Att. 41.) Tri-State does not argue that FINN learned about this agreement earlier than August 8, 2016. Mr. Quirk considered the new agreement to be a "significant" development in Tri State's relationship with Fecon. (Tri-State Dep. at 37-38.) The new agreement elevated Tri-State from being one of approximately 240 Tier 1 Fecon dealers to one of only approximately 20 Tier 2 Fecon dealers. (Fecon Dep. at 25.)

### C. Failed Negotiations Regarding the 2016 Agreement

On August 9, 2016, just after FINN learned about Tri-State's dealer agreement with Fecon, Mr. Hoffman e-mailed Mr. Casey explaining that in April 2016, he thought Tri-State was "on board" with the 2016 Agreement changes but felt "a bit duped now as this was well before [Tri-State] had proceeded with anything Fecon and knew what we were asking." (Wittrock Decl. ¶ 43, Att. 42.) Then, on August 16, 2016, another FINN dealer e-mailed Mr. Hoffman expressing confusion about Tri-State's expanded relationship with Fecon. (Wittrock Decl. ¶ 44, Att. 43.) The other FINN dealer explained that they passed on a "good opportunity" with Fecon "based on [FINN's] strong opposition to us (and all of [FINN's] dealers) handling any products that would provide profitability to a competitor of FINN's." (*Id.*) Mr. Hoffman responded that FINN was "alerted" to the Tri-State relationship one week earlier, but that FINN was "strongly opposed to the Fecon dealer agreement." (*Id.*)

On August 19, 2016, FINN asked Tri-State not to attend FINN's annual dealer conference. (Tri-State Dep. at 82-83; Lee Dep. at 152.) Mr. Lee testified that he and

Mr. Hoffman told Mr. Quirk that Tri-State could not attend the dealer conference because

Tri-State had not signed the 2016 Agreement.  (Lee Dep. at 152.)  One week later, FINN

sent Tri-State a letter stating:

> [S]ince FINN does not currently have a signed dealer agreement with your
> organization for 2016, and because we understand you have entered into a
> formal dealer agreement with Fecon that competes with Finn and our
> non-compete clause in the 2016 agreement, effective immediately, the
> dealer agreement we provided to you in early 2016 that has remained
> unsigned is now null and void.
>
> We are interested in having additional discussions with you to once again
> become a dealer with our organization, but the conditions noted in our 2016
> agreement would need to be fulfilled and Finn would need to re-issue the
> 2016 agreement. Should we not receive a response to achieve the goal of a
> renewed establishment as an authorized Finn dealer by the end of the day,
> Thursday, September 1, 2016 we will conclude that this formally ends our
> business communication relative to partnering together in a
> dealer-manufacturer relationship.

(Wittrock Decl. ¶ 45, Att. 44.)  On August 30, 2016, Tri-State responded to FINN's letter

and denied that Fecon was a competitor of FINN, expressed a belief that Apex was a

standalone company, and disclaimed any interest in selling Apex products.  (Chiquoine

Aff. ¶ 37, Ex. 34.)  Tri-State opened and closed the letter by expressing its desire to

continue its dealer relationship with FINN.  (*Id.*)  However, Tri-State stated that for it to

sign the 2016 Agreement, the parties would "need to reach an understanding that

Tri-State's relationship with Fecon does not violate the non-compete provisions of the

Finn Dealer Sales Agreement."  (*Id.*)

To continue negotiations, Tri-State and FINN arranged a meeting for October 11,

2016, at FINN's headquarters in Ohio.  At the October 11 meeting, FINN explained its

competitive concerns about Fecon and Siteworx.  (Quirk Aff. ¶ 20.)  Mr. Lee testified

that FINN and Tri-State had attempted to negotiate the 2016 Agreement since August 2016, but that at the October 11, 2016 meeting, Mr. Quirk "stated that he did not want to be a FINN dealer." (Lee Dep. at 197.) By the end of the meeting, FINN and Tri-State were unable to reach an agreement regarding the noncompete provision, and consequently, Tri-State never signed the 2016 Agreement.

One week after the meeting, FINN sent a letter to Tri-State stating: "We cannot support a dealer partner that has made the business decision to partner with a competing manufacturer. While it may provide new opportunities for Tri-State Bobcat, it is not part of our strategic business plan as Finn Corporation looks to the future." (Wittrock Decl. ¶ 48, Att. 47.) FINN closed the letter by requesting that Tri-State "agree to end your business relationship with FINN Corporation." (*Id.*) Tri-State never responded, and instead, FINN sent a follow-up letter to Tri-State dated October 31, 2016, stating that "effective November 11, 2016, [FINN] will terminate the dealer business relationship between Tri-State Bobcat and FINN Corporation." (Wittrock Decl. ¶ 49, Att. 48.) Mr. Quirk confirmed that "[o]n November 11, 2016, FINN locked Tri-State out of FINN's dealer portal thereby precluding any further FINN-brand purchases by Tri-State." (Quirk Aff. ¶ 22.)

## IV.    Procedural Background

Plaintiff first filed this lawsuit against Defendant on December 2, 2016. On July 19, 2017, Plaintiff filed its Amended Complaint, asserting the following claims: (1) violation of MAEDA (Count I); (2) violation of MHUEMDA (Count II); violation of WFDL (Count III); and (4) breach of contract (Count IV). (Am. Compl. ¶¶ 55-111.)

Defendant answered Plaintiff's Amended Complaint and asserted two counterclaims for breach of contract. (Doc. No. 31.) The parties have since engaged in substantial discovery on these issues, and the parties' cross-motions for summary judgment are ripe for the Court's review. (*See* Doc. Nos. 36, 52.) Plaintiff seeks judgment against Defendant on Counts I and II of the Amended Complaint. Defendant seeks dismissal of Plaintiff's claims, judgment in Defendant's favor on its breach of contract counterclaims, and an award of damages.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty.*

*of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported

motion for summary judgment "may not rest upon the mere allegations or denials of his

pleading, but must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Equipment Statute Claims

Tri-State brought claims under MAEDA, MHUEMDA, and WFDL (collectively,

the "Equipment Statutes"), contending that FINN improperly terminated its dealer

agreement without the notice or cause required by the statutes, or alternatively, that FINN

sought to substantially change the competitive circumstances of the parties' agreement.

Both parties seek summary judgment in their favor on the two Minnesota statutory

claims.  FINN also seeks summary judgment on the Wisconsin statutory claim.

Minnesota courts have observed that the Equipment Statutes serve the same

purpose and provide nearly identical protections to dealers.  *See River Valley Truck Ctr.,

Inc. v. Interstate Cos., Inc.*, 704 N.W.2d 154, 162 (Minn. 2005) (noting that the purpose

of the statutes is to "'equalize the power of grantors and dealers,' and not to 'insulate

dealers from all economic reality'") (quoting *Ziegler Co., Inc. v. Rexnord, Inc.*,

147 Wis. 2d 308 (Wis. 1988)).  All three Equipment Statutes prohibit equipment

manufacturers from taking certain adverse actions against a dealer, including terminating,

failing to renew, or substantially changing the competitive circumstances of a dealership

agreement without good cause.  Minn. Stat. §§ 325E.062, subd. 1, 325E.0681, subd. 1;

Wis. Stat. § 135.03.  Because the Equipment Statutes all prohibit the same conduct, the

Court first considers whether the evidence shows that FINN took such adverse action against Tri-State.

**A.     Termination**

Tri-State first alleges wrongful termination under the Equipment Statutes.  FINN responds that there was no existing contract for FINN to terminate because the 2015 Agreement "expired by its own terms on December 31, 2015, and Tri-State explicitly refused to sign FINN's proposed 2016 agreement."  (Def.'s Memo. at 28-29.)  A termination claim relies on the existence of a contract, and, consequently, the Court first evaluates whether the parties had an express or implied contract.

The 2015 Agreement expired by its own terms at the end of the "calendar year 2015."  (2015 Agreement.)  Tri-State argues, however, that there is a genuine dispute of fact whether the parties modified the end-date of the 2015 Agreement by their conduct.  (Pl.'s Resp. at 15.)  "It is well settled that the conduct of contracting parties may be evidence of a subsequent modification of their contract."  *Yaritz v. Dahl*, 367 N.W.2d 616, 618 (Minn. Ct. App. 1985).  "Whether a pre-existing agreement has been modified depends on the parties' objective manifestations, not their subjective understanding."  *Beer Wholesalers, Inc. v. Miller Brewing Co.*, 426 N.W.2d 438, 440 (Minn. Ct. App. 1988), *review denied* (Minn. Aug. 24, 1988).  The general prohibition against parol evidence does not apply when evidence is used "to explain the parties' conduct subsequent to the written agreement."  *Flynn v. Sawyer*, 272 N.W.2d 904, 908 (Minn. 1978).

Here, Tri-State claims that the parties operated in the same manner throughout 2016 as they had in previous years, thereby effectively extending the 2015 Agreement. The record reflects otherwise though. Had FINN intended to modify the end date of the 2015 Agreement, it would not have sent either the early February 2016 e-mails to its dealers expressing competitive concerns or the 2016 Agreement in mid-March. Additionally, FINN repeatedly tried to get Tri-State to sign the 2016 Agreement from mid-March through the time of the parties' ultimate impasse. Contrary to Tri-State's claim, the parties did not operate in the exact same manner as previous years. Instead, FINN spent most of the year attempting to get Tri-State to sign a new agreement, and Tri-State negotiated and executed an agreement with Fecon that Tri-State knew FINN opposed. No record evidence supports Tri-State's modification-by-conduct argument sufficient to present a factual dispute for trial. The Court therefore concludes that no express contract existed between the parties after December 31, 2015.

Absent the existence of an express contract, the inquiry turns to whether a contract may be implied from the conduct of the parties. *Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 854 (D. Minn. 1989). An implied-in-fact contract is one inferred from the circumstances and conduct of the parties. *Gryc v. Lewis*, 410 N.W.2d 888, 891 (Minn. Ct. App. 1987). Where a party alleges the existence of an implied contract, the party must still prove all essential elements of contract. *Cooper v. Lakewood Eng'g & Mfg. Co.*, 874 F. Supp. 947, 955 (D. Minn. 1994). For there to be an express or implied contract, there must be objective evidence of a meeting of the minds as to the terms of the contract. *Roberge v. Cambridge Co-op. Creamery*, 79 N.W.2d 142, 146 (Minn. 1956).

The existence of an implied contract is a question of fact ordinarily decided by a jury. *See Herron v. Green Tree Acceptance, Inc.*, 411 N.W.2d 192, 195 (Minn. Ct. App. 1987).

Both parties cite *Webb Candy, Inc. v. Walmart Stores, Inc.*, Civ. No. 09-2056, 2010 WL 2301461 (D. Minn. June 7, 2010), in support of their arguments over the existence of an implied contract. (Pl.'s Memo. at 32; Def.'s Resp. at 49-50.) In *Webb Candy*, Judge Schiltz analyzed supplier agreements and the course of performance between the parties in concluding that the parties did not create implied contracts after the supplier agreements expired. *Webb Candy*, 2010 WL 2301461, at *9-10. Judge Schiltz noted that courts find implied contracts "when the conduct of the parties satisfies two conditions: First, the performance that allegedly gives rise to the new contract must flow continuously from the performance that took place under the original contract. . . . Second, the parties' performance must be substantially unchanged following the contract's expiration." *Id.*, at *9. The presumption of an implied contract, however, can be rebutted by evidence that one or both of the parties did not intend to enter into a new, implied contract. *Id.* Evidence of that intent includes failed negotiations by the parties to reach a new agreement and correspondence showing a change in the business relationship of the parties. *Id.* (citing *Sevel Argentine, SA v. General Motors Corp.*, 46 F. Supp. 2d 261, 268 (S.D.N.Y. 1999), and *Computerized Med. Imaging Equip. v. Diasonics Ultrasound, Inc.*, 758 N.Y.S.2d 228, 230 (N.Y. App. Div. 2003)).

Here, Tri-State argues that FINN's conduct shows that the parties created an implied contract in 2016 based on the same terms as the 2015 Agreement. Specifically, Tri-State demonstrated that FINN: (1) "promoted Tri-State as a dealer on its website and

social media marketing sites"; (2) continued sending Tri-State its quarterly dealer newsletter; (3) permitted Tri-State continual access to FINN's dealer portal; (4) included Tri-State in its dealer promotions; (5) sent Tri-State dealer pricing updates; (6) "regularly communicated and met with" Tri-State employees; and (7) continued to sell FINN equipment to Tri-State at a discount. (Pl.'s Resp. at 17 (citing Quirk Aff. ¶ 16; Chiquoine Aff. ¶¶ 27, 29-34, Exs. 24, 26-31; Chiquoine Supp. Aff. ¶ 6, Ex. 4 at 1104; 123).) These facts show that the parties' conduct satisfies the two conditions outlined in *Webb Candy*.

The inquiry, however, does not end there. Here, as in *Sevel Argentine*, there is undisputed evidence showing that the parties failed to reach a new agreement because of disagreement over the noncompete provision. 46 F. Supp. 2d at 268; (Hoffman Dep. at 32; Tri-State Dep. at 22-25, 43-44, 77-78; Wittrock Decl. ¶¶ 29-31, Atts. 28-30.) Moreover, as in *Diasonics Ultrasounds*, there is undisputed evidence showing that the parties' correspondence during 2016 was focused on the proposed 2016 Agreement rather than routine business issues. (*See, e.g.*, Wittrock Decl. ¶¶ 29-31, Atts. 28-30.) FINN attempted to get Tri-State to sign the 2016 Agreement, but also made its intentions clear that it would not continue a business relationship with a dealer that was in business with a company it viewed as a competitor. (Lee Dep. at 152; Tri-State Dep. at 73; Wittrock Decl. ¶ 45, Att. 44.) There is also undisputed evidence that after Tri-State learned of FINN's concerns about Fecon and saw FINN's proposed noncompete provision, Tri-State expanded its relationship with Fecon, directly undermining FINN's proposed 2016 Agreement. (Chiquoine Aff. ¶ 21, Ex. 18; Quirk Dep. at 73; Tri-State Dep. at 24; Wittrock Decl. ¶¶ 30, 40, Atts. 29, 39.) Finally, Mr. Quirk's testimony makes clear that

18

he did not view FINN's concerns about Fecon as legitimate, and had no intention of signing the 2016 Agreement as presented.

Even viewing all of these facts in the light most favorable to Tri-State, the Court cannot find, as a matter of law, that FINN and Tri-State intended to enter into an implied contract after the 2015 Agreement expired. The Court therefore concludes that Tri-State's wrongful-termination claims under the Equipment Statutes fail.

**B.      Substantial Change in Competitive Circumstances**

Tri-State also argues that the "non-compete provision in the 2016 Agreement had serious implications on Tri-State's competitive circumstances." (Pl.'s Resp. at 25.) Tri-State claims that the noncompete provision therefore violates the Equipment Statutes' prohibition on a manufacturer substantially changing the competitive circumstances of a dealer agreement without good cause. FINN counters that the Equipment Statutes "do not protect Tri-State from a mere loss of desired profits, nor do they provide a mechanism to avoid a non-discriminatory, system-wide change to the FINN dealership system that Tri-State does not like." (Def.'s Memo. at 35.)

To determine whether there has been a substantial change in the competitive circumstances of a dealer agreement, the Court looks to "the prevailing conditions, surroundings, or background of a dealership agreement." *Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. P'ship*, 977 F. Supp. 1386, 1392 (D. Minn. 1997) (emphasis omitted). A substantial change in the competitive circumstances

> is a change that has a substantially adverse although not necessarily lethal
> effect on the dealership. It is a change that is material to the continued
> existence of the dealership, one that significantly diminishes its viability, its

ability to maintain a reasonable profit over the long term or to stay in business.

*Astleford Equip. Co., Inc. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn. 2001). Moreover, the Equipment Statutes do not "protect a dealer from nearly all new competition that threatens the dealer's profits." *Id.*

Here, Tri-State contends that the noncompete provision would have "forced [Tri-State] to forgo an existing product line, and potentially many more product lines in the future." (Pl.'s Resp. at 26.) Tri-State also notes that its addition of the Fecon tractors has allowed its business to "thrive," and that the noncompete provision would have barred Tri-State from carrying that product line. Finally, Tri-State argues that agreeing to the noncompete provision "could end up being catastrophic to Tri-State's long term viability and profitability" in the event that one of FINN's primary product lines "merged with or acquired an *actual* FINN competitor." (*Id.* at 27 (emphasis in original).) But the consequences that Tri-State points to are either conjectural or belied by the undisputed evidence. Specifically, Tri-State agrees that its business has been thriving since it deepened its relationship with Fecon. (Wittrock Decl. ¶ 6, Att. 5; Tri-State Dep. at 70-72.) Tri-State has been able to continue renting FINN products to its customers, which produces higher profit margins than sales of FINN equipment. (Quirk Dep. at 125.) Moreover, Mr. Quirk testified that in 2015, sales of FINN equipment amounted to less than 5% of Tri-State's revenue. (Tri-State Dep. at 66.) Although there is record evidence that the growth in Tri-State's sales was less in 2017 than its growth in prior years, the evidence is undisputed that Tri-State is still achieving year-over-year growth in

its sales and revenue.  (*Id.* at 70-71.)  The change in competitive circumstances present

here may have negatively impacted Tri-State's profits and business model.  But the

evidence is undisputed that the noncompete provision did not "significantly diminish"

Tri-State's viability or threaten its ability to maintain a reasonable profit long-term.  The

Court therefore concludes that Tri-State's substantial-change claims under the Equipment

Statutes fail.

### C.      Failure to Renew Without Good Cause

The Court next considers Tri-State's argument that "FINN failed to renew

Tri-State's dealership agreement for good cause."  (Pl.'s Resp. at 22.)  As a preliminary

matter, courts have held that a grantor's offer of a nonidentical contract at a renewal

period does not constitute a nonrenewal by the grantor.  *See Meyer v. Kero-Sun, Inc.*,

570 F. Supp. 402, 406 (W.D. Wis. 1983); *Ziegler Co. v. Rexnord, Inc.*, 433 N.W.2d 8, 11

(Wis. 1988).  FINN's offer of the proposed 2016 Agreement therefore does not constitute

nonrenewal as a matter of law.  Even assuming, however, that FINN failed to renew

Tri-State's dealer agreement, the Court nevertheless finds that FINN had good cause to

ask Tri-State to agree to the noncompete provision in the proposed 2016 Agreement.

To show good cause, a party must establish proof of failure to substantially

comply with "essential and reasonable requirements imposed upon the dealer" by the

dealership agreement, so long as the grantor-manufacturer does not discriminate in the

imposition of the requirements between similarly situated dealers.  Minn. Stat.

§§ 325E.062, subd.1, 325E.0681, subd. 1; Wis. Stat. § 135.02(4).  The Eighth Circuit

considered the reasonableness of a noncompete provision in *Minnesota Supply Co. v.*

21

*Raymond Corp.*, 472 F.3d 524 (8th Cir. 2006). In *Raymond Corp.*, the jury found that a noncompete provision in an amended dealer agreement constituted a substantial change in competitive circumstances. *Id.* at 530-32. The Eighth Circuit reversed the jury verdict and concluded that MHUEMDA does not "limit the use of exclusivity provisions." *Id.* at 538. In reaching its conclusion, the Eighth Circuit noted that in typical manufacturer-dealer relationships, "a manufacturer behaves reasonably in selling equipment only to dealers who in return promise to focus exclusively on the manufacturer's products." *Id.* at 539. Therefore, a noncompete provision "may reasonably be deemed essential by manufacturers in their quest to maintain a profitable share of a competitive market." *Id.*

Here, FINN's competitive concerns about Fecon are well documented in the record. Significantly, Fecon itself admits that it owns a significant percentage of Siteworx, which produces the Apex brand hydroseeder. (Fecon Dep. at 79.) Fecon and Siteworx are significantly intertwined in their central operations as well, including accounting, marketing, and management services. (*Id.* at 117-118.) The undisputed evidence also reflects that FINN had concerns about competition from Fecon in late 2015 and early 2016. (Wittrock Decl. ¶¶ 22, 24, 25, Atts. 21, 23, 24.) Although Tri-State argues that Fecon is not in fact a competitor of FINN, it presents no evidence of that claim, instead relying on claims that Fecon and Siteworx are not related. The undisputed evidence in the record shows otherwise, and consequently, FINN's noncompete solution is reasonable and essential. *See Raymond Corp.*, 472 F.3d at 538-39.

Tri-State also argues that FINN cannot demonstrate good cause because FINN treated Tri-State differently than other similarly situated dealers. (Pl.'s Resp. at 31.)

FINN claims that it treated Tri-State the same way as all other FINN dealers that also sold Fecon products. (Def.'s Resp. at 21.) Specifically, FINN points to identical e-mails expressing its concerns about Fecon that it sent to eight dealers it knew or thought sold Fecon products. (Wittrock Decl. ¶ 29, Att. 28.) The e-mails and Mr. Casey's affidavit also indicate that FINN followed up with each of the eight dealers by telephone. (*Id.*; Casey Decl. ¶ 2.) Critically, FINN states that all the dealers except Tri-State have signed a 2016 agreement, none expanded their Fecon relationships after learning of FINN's concerns, and FINN agreed to some of their requests to amend the noncompete to grandfather in their existing Fecon lines. (Casey Decl. ¶ 6; Hoffman Dep. at 83.) The undisputed evidence shows that Tri-State is the only dealer that expanded its relationship with Fecon to a full-line Tier 2 dealer after receiving notice of the noncompete provision. (*See, e.g.*, Lee Dep. at 221; Hoffman Dep. at 83.) FINN has therefore shown that it applied the noncompete provision in a nondiscriminatory way. The Court therefore concludes that FINN has shown it had good cause to add the noncompete provision to the 2016 Agreement and good cause to not renew Tri-State's dealer agreement when Tri-State significantly expanded its relationship with Fecon after learning of FINN's concerns.[4]

---

[4] Because the Court concluded that FINN did not terminate or substantially change the competitive circumstances of its dealer agreement with Tri-State, it did not need to reach the good-cause analysis in relation to that alleged conduct. The Court's good-cause analysis, however, would apply equally to those prongs of the Equipment Statutes.

Based on the foregoing, the Court grants FINN's motion to the extent it requests dismissal of Tri-State's claims under the Equipment Statutes.[5]

## III.    Tri-State's Breach of Contract Claim

FINN also moves for summary judgment on Tri-State's breach of contract claim. Tri-State contends that FINN improperly terminated the 2015 Agreement without providing 30 days' written notice as required by the agreement. Tri-State's claim, however, relies on the existence of an implied contract throughout 2016. The undisputed evidence shows that the 2015 Agreement expired on its own terms on December 31, 2015, and no implied contract existed in 2016 between the parties. Because no contract existed between the parties in 2016, the Court finds that FINN is entitled to summary judgment on Tri-State's breach of contract claim. Thus, the Court grants FINN's motion to the extent that it seeks to dismiss Tri-State's breach of contract claim.

## IV.    FINN's Counterclaims

FINN moves for summary judgment on its breach of contract counterclaims for (1) unpaid finance charges for equipment Tri-State previously ordered and received from FINN, and (2) amounts owed as penalties for sales outside of Tri-State's designated territory. Specifically, FINN claims that it is entitled to $211,474.35 for unpaid finance charges and penalties for out-of-territory sales. (Def.'s Memo. at 49; Def.'s Reply at 8.)

---

[5]     Because the Court resolves the Equipment Statutes claims on the issue of adverse action, the Court does not reach the issue of whether FINN equipment fits within the categories of equipment covered under the Minnesota Equipment Statutes. If the Court were to reach the issue, it would conclude that issues of fact exist concerning the use of FINN's equipment that preclude summary judgment.

The elements of a breach of contract claim are: "'(1) formation of a contract; (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant; and (3) breach of contract by defendant.'" *Watkins Inc. v. Chilkoot Distrib., Inc*., 719 F.3d 987, 991 (8th Cir. 2013) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)).

## A. Finance Charges on Amounts Owed

FINN claims that Tri-State "agreed to pay 1.5 percent per month in interest on past due amounts" for products FINN supplied to Tri-State. (Doc. No. 31 at 17.) Regarding the finance charges, Tri-State contends that the Court must deny summary judgment because "FINN has failed to identify the contract under which these finance charges are allegedly owed." (Pl.'s Resp. at 42.) In response, FINN points to several invoices that state that "[a]ll accounts over 30 days subject to a 1-1/2% monthly finance charge." (Casey Decl. ¶ 11, Ex. 2.) FINN also points to e-mails between FINN's Chief Financial Officer and Tri-State's Accounts Payable attaching a report showing principal and interest owed in the amount of $349,446.59 as of October 19, 2017 (the "October 19, 2017 Report"). (*Id.* ¶ 10, Ex. 1.) Tri-State counters that the invoices and the October 19, 2017 Report have "no legal bearing on whether Tri-State ever agreed to" pay the finance charges. (Pl.'s Resp. at 43.)

Under the UCC, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by the prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods." Minn. Stat. § 336.2–206(1)(b). Tri-State's order, therefore, "invited" FINN's acceptance

25

through the prompt shipment of the FINN products listed on the invoices. And that is

precisely what occurred, as the parties do not dispute that FINN shipped the products that

Tri-State ordered. Accordingly, there was an offer (Tri-State's order) that was accepted

(by FINN shipping the products), resulting in a contract. *See, e.g.*, *Jesberg v. Baxter*

*Healthcare Corp.*, Civ. No. 97–1062, 2006 WL 228872, at *3 (D. Minn. Jan. 30, 2006)

("A party can demonstrate his acceptance of an offer to buy goods by simply shipping the

requested goods without objection.").

Even though the 1.5% finance charge first appeared in the invoice, it is

nevertheless enforceable unless it materially altered the contracts. Minn. Stat. §

336.2-207(2)(b) (providing that additional contract terms will be deemed accepted unless

they "materially alter" the terms of the offer). "A term materially alters a contract if it

would result in surprise if incorporated without knowledge by the other party." *United*

*Sugars Corp. v. U.S. Sugar Co., Inc.*, Civ. No. 13-1485, 2015 WL 1529861, at *5 (D.

Minn. Apr. 2, 2015) (citing *Marvin Lumber & Cedar Co. v. PP Indus., Inc.*,

401 F.3d 901, 910-11 (8th Cir. 2005)). Here, there is no evidence in the record that Tri-

State was unaware of the 1.5% finance charge on accounts past due by 30 days or more.

To the contrary, the 2015 Agreement expressly stated that FINN had the right to charge

interest up to 1.5% per month on any past due balance. Moreover, the invoices submitted

into evidence are identical, and each includes the 1.5% finance charge in the same

location next to the total amount owed near the bottom of the second page of the two-

page invoice. (*See* Casey Decl. ¶ 11, Ex. 2.) A brief review of the invoice would

therefore reveal the finance charge provision to the reader. Under these circumstances,

the Court concludes that the finance charge provision is an enforceable part of the contract of sale.

FINN states that Tri-State paid $290,196.14 of the $349,446.59 alleged to be due, which represents the principal amount owed for the purchases. (Casey Decl. ¶¶ 10, 12.) FINN claims, and the October 19, 2017 Report reflects, that Tri-State owes FINN $59,250.45 in finance charges. (*Id.* ¶¶ 10, 12, Ex. 1.) Tri-State has not produced any evidence indicating otherwise. The undisputed facts therefore show that Tri-State agreed to pay the 1.5% finance charge and has not done so, resulting in an amount owed of $59,250.45. The Court grants FINN's motion on its breach of contract counterclaim on amounts owed for finance charges.

### B.    Penalties on Out-of-Territory Sales

The 2015 Agreement provides: "Dealer selling new equipment to end user customers outside the Dealer's designated territory as described in Appendix 'A' will result in a 20% charge-back penalty from MSRP to be commissioned back to the affected FINN sales outlet." Tri-State argues that this language indicates that "sales outside a dealer's territory are not contractually prohibited, but merely subject to penalty," effectively making out-of-territory sales a "business decision." (Pl.'s Resp. at 40.) Tri-State further argues that the 2015 Agreement does not provide for out-of-territory penalties to be paid "*to FINN.*" (*Id.* at 39 (emphasis in original).) Finally, Tri-State argues that FINN either approved of, or ratified any sales that Tri-State made outside its designated territory. (*Id.* at 41.)

The Court disagrees.  There is no dispute that the dealer agreements between FINN and Tri-State, including the 2015 Agreement, designated certain zip codes in Minnesota and Wisconsin as Tri-State's territory.  (*See, e.g.*, 2015 Agreement.)  And there is no dispute that the language of the dealer agreements provided for a charge-back penalty, in the amount of 15% for 2012 and 2013, (Wittrock Decl. ¶ 5, Att. 4 at 14033), and in the amount of 20% for 2014 and 2015, (*Id.* ¶ 8, Att. 7 at 14020).  No matter how it is characterized – as a penalty or as a business decision – Tri-State agreed to pay a percentage of the Manufacturer's Suggested Retail Price for any sales made outside its designated territory.  The record also lacks any evidence that FINN told Tri-State that it was authorized to make out-of-territory sales, or that it would not incur the charge-back penalties for such sales.

FINN has produced evidence that Tri-State's out-of-territory sales during 2012 and 2013 totaled $152,875.  (Wittrock Decl. ¶¶ 55-57, Atts. 54-56.)  The 15% charge-back penalty on the 2012-2013 sum is therefore $22,931.25.[6]  FINN has also shown that Tri-State's out-of-territory sales during 2014 and 2015 totaled $646,462.  (*Id.*)  The 20% charge-back penalty on the 2014-2015 sum is therefore $129,292.40.  In total, Tri-State is liable for $152,223.65 in charge-back penalties under the dealer agreements.  The Court therefore grants FINN's motion on its breach of contract counterclaim on unpaid penalties for out-of-territory sales.

---

[6]    In its brief, FINN calculates the 15% charge-back penalty as $22,931.<u>50</u>.  (Def.'s Memo. at 51.)  The Court added the 2012 ($43,005) and 2013 ($109,870) totals identified in Attachment 56 to the Wittrock Declaration, returning a sum of $152,875.  15% of $152,875 amounts to $22,931.<u>25</u>.  FINN accurately calculated the 2014-2015 penalty.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. [52]) is **DENIED**.

2.      Defendant's Motion for Summary Judgment (Doc. No. [36]) is **GRANTED**.

3.      Plaintiff's Amended Complaint (Doc. No [28]) is **DISMISSED WITH PREJUDICE**.

4.      Defendant's counterclaims for breach of contract are **GRANTED**.

5.      Plaintiff is liable to Defendant for unpaid finance charges and charge-back penalties in the amount of $211,474.10.[7]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 6, 2018                           s/Donovan W. Frank
                                                   DONOVAN W. FRANK
                                                   United States District Judge

---

[7]      Even though the Court has resolved all claims and counterclaims, in the event that the parties would like the Court's assistance in pursuing a final settlement, they may contact chambers and the Court will help coordinate priority scheduling of a settlement conference with the Magistrate Judge.